IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOCELYN CHATHAM**, Administrator of the Estate of **MARVIN T. MCDONALD**,  )<br>)<br>**Plaintiff**, )<br>)<br>vs. )<br>)<br>**RANDY DAVIS, PHILLIP PARKHILL,** )<br>**BRIAN FAGERLAND, JAMES** )<br>**GOLDSBOROUGH, PHILLIP DANIELS,** )<br>**DAVID SANDERS, WEXFORD HEALTH** )<br>**SOURCES, INC., RHONDA REUTER,** )<br>**AMY HUSEMAN, JANET DAUGHERTY,** )<br>**DR. LARSON,** )<br>)<br>**Defendants.** | Case No.   11-cv-0650-MJR-SCW |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

### I.   Introduction

Before the Court are two motions for summary judgment filed by Defendants. Specifically, Defendants Randy Davis, Phillip Parkhill, Brian Fagerland, James Goldsborough, Phillip Daniels, and David Sanders have filed a motion for summary judgment (Doc. 98 & 99) arguing that they were not deliberately indifferent to Marvin McDonald's asthma attack because they did not delay providing him with medical care. Plaintiff subsequently filed a Response (Docs. 106, 108, & 109) and those Defendants filed a Reply (Doc. 117). Defendants Wexford Health Sources, Inc., Rhonda Reuter, and Dennis Larson have also filed a motion for summary judgment on Plaintiff's deliberate indifference claims (Docs. 100, 101, & 102).[1]  Plaintiff subsequently filed a Response to that motion

---

[1] The Court notes that Amy Huseman and Janet Daugherty were also previously defendants in this case, but when Plaintiff filed her Amended Complaint on October 23, 2012, Plaintiff sought to dismiss those two

(Docs. 105, 107, & 110) and those Defendants filed a Reply (Docs. 115 &116). Based on the following, the Court **GRANTS IN PART AND DENIES IN PART** both of Defendants' motions for summary judgment (Docs. 98 and 100).

## II. Factual Background

The events which make up the basis of Plaintiff's Complaint occurred on May 26-27, 2010 while Marvin McDonald was housed at Pickneyville Correctional Center. Marvin McDonald began experiencing asthma symptoms at 5:00 p.m. on May 26, 2010 and informed his cellmate, Nathaniel Stokes, of his breathing problems sometime between 9:00 p.m. and 10:00 p.m. (Doc. 99 Ex. B; Doc. 108 Ex. B). At some point Nathaniel Stokes began beating on the cell door in order to get the attention of correctional staff, although the parties dispute when this occurred (Doc. 99 Ex. B). There are no panic buttons or other methods to alert IDOC staff other than to bang on the cell door and/or yell for help. Plaintiff contends that this occurred sometime between 11:30 and 11:45 and at least twenty (20) to thirty-five (35) minutes before any correctional officers responded (Doc. 99, Exs. B, C, D, E, F, G, H). Defendants contend that this occurred shortly after midnight (*Id.*). According to several inmates in the cell unit on May 26-27, it took 20 to 35 minutes for officers to respond (*Id.*).

Defendants Daniels, Parkhill, Goldsborough, Fagerland, and Sanders were all assigned to work in the segregation unit from 11:00 p.m. May 26, 2010 until 7:00 a.m. May 27, 2010 (Doc. 99 Ex. I at p. 6; Ex. K at p.8; Ex. M at p.5). Defendant Daniels maintains that he learned of McDonald's need for medical attention from Parkhill shortly after beginning the count of inmates at midnight on May 27, 2010 (Doc. 99 Ex. I at pp. 7-8, 24). Defendant Daniels maintains he never heard yelling from any inmates prior to Parkhill informing him of McDonald's issues (*Id.* at p. 25). Defendant Parkhill

---

defendants from her case (Doc. 67). Defendants Huseman and Daugherty filed a consent to that dismissal (Doc. 82) which this Court inadvertently denied (Doc. 83). However, the Court now notes that based on Plaintiff's motion to amend her Complaint, Defendants Huseman and Daugherty are no longer parties to this case and thus the Court DISMISSES the claims against them without prejudice.

stated he conducted a cell count at midnight and when he reached McDonald's cell, he was called over by McDonald and informed that he was suffering from an asthma attack (Doc. 99 Ex. K at pp. 15, 20). According to Parkhill, he did not see inmate Stokes and he never heard anyone yelling prior to approaching McDonald's cell (*Id.* at p. 20).

While Plaintiff agrees that it was Parkhill who approached McDonald's cell, he maintains that no count was conducted. Parkhill's records indicated there was a count at 12:05 and the report was marked "OK" with no indication that there were issues with McDonald, which Plaintiff points to as evidence that a count did not occur. Parkhill testified that he wrote "okay" on his wing check report prior to conducting a count because he was on the wing and there were no problems (Doc. 108 Ex. N at pp. 36-37). Parkhill maintained that if there had been a problem, an inmate would have been yelling at him (*Id.*). Stokes and other inmates testified that Stokes had to bang on the cell door and yell for medical help to get the attention of correctional staff because the officers were not on the gallery (Doc. 99 Exs. B-H).

When Parkhill arrived at McDonald's cell and saw his distress, Parkhill stopped his count, proceeded to Daniels, and informed him of McDonald's name, inmate number, and his breathing problems (Doc. 99 Ex. I at pp. 24-25; Ex. K at p. 21). At that time, Defendants Parkhill and Daniels called the Health Care Unit (*Id.*; Ex. L at p. 18; Ex. M at p. 11). Parkhill did not issue a Code Three Emergency Alert (Doc. 108 Ex. N at p. 22). Medical personnel arrived between midnight and 12:15 a.m. on May 27, 2010. Before the medical staff attended to McDonald, the officers removed Stokes from the cell and handcuffed McDonald's hands behind his back. Medical personnel assessed McDonald's condition and moved him to the health care unit. According to some inmates, McDonald did not appear to be conscious or breathing when he was taken from his cell (Doc. 107 Exs. C, H, I, K, L, & M).

McDonald arrived to the health care unit around 12:15 a.m. on May 27, 2010 (Doc. 101 Ex. A at p. 73; Ex. B at p. 9). When the health care unit took McDonald's vitals he had a pulse of 140 beats per minute, was wheezing, and using his accessory muscles to aid in breathing (Doc. 107 Ex. A; Ex. B at pp. 73-74). He also had a peak expiratory flow rate (PEFR) of 150 (Doc. 107 Ex. B at pp. 73-74). The entire time that McDonald was in the health care unit, his PEFR was never higher than 150, while the average PEFR for a male McDonald's age and height is 610 (Doc. 107 Ex. A, P, & Q). Defendant Reuter admitted McDonald to the infirmary (Doc. 101 Ex. B at pp. 43-44). Defendant Reuter obtained McDonald's vitals, including the level of oxygen saturation in his blood and peak expiratory flow rate ("PEFR") (Doc. 101 Ex. A at p. 73; Ex. B at p. 16). At that time, McDonald's oxygen saturation was 90% (Doc. 101 Ex. A at p. 73). When McDonald was admitted to the health care unit, Defendant Reuter also tried to reach Dr. Larson by phone and left him a message on McDonald's status (Doc. 101 Ex. A at p. 73; Ex. B at pp. 21-22, 50). McDonald was treated for his asthma with an albuterol nebulizer, which administers albuterol in the form of a mist (*Id.* Ex. A at p. 74; Ex. B at p. 18). McDonald's PEFR level was tested after each albuterol treatment (Doc. 101 Ex. B at pp. 18, 30, 42). Oxygen and epinephrine, a form of adrenaline, was also administered to McDonald (Doc. 101 Ex. A at p. 74; Ex. B at pp. 17-18, 43-44).

At 2:00 a.m. Dr. Larson spoke with Defendant Reuter (Doc. 101 Ex. B at p. 38; Doc. 107 Ex. T at p. 60). At that time, Dr. Larson ordered Defendant Reuter to give McDonald an additional nebulizer treatment, continue his oxygen, and give him prednisone, a steroid used to treat asthma (Doc. 101 Ex. A at p. 75; Ex. B at pp. 38, 49-50). Dr. Larson also ordered Defendant Reuter to check McDonald's blood pressure while sitting and standing, and also to provide hydration (*Id.* Ex. A at p. 75; Ex. B at p. 38). Dr. Larson called the infirmary to check McDonald's status at 2:30 a.m. (*Id.*). At that time, McDonald's oxygen saturation level was 99% but he was still using accessory

muscles to breath (*Id.* Ex. A at p. 76; Ex. B at pp. 38, 62). Dr. Larson ordered Defendant Reuter to have McDonald transferred to Pinckneyville Community Hospital via ambulance at 2:30 a.m. (Doc. 101 Ex. B at p. 38).

McDonald was then transferred to Pinckneyville Community Hospital. Dr. Larson called the hospital to provide staff with information concerning McDonald's treatment (Doc. 101 Ex. C at pp. 50-52). Nurse Reuter also called the hospital to check McDonald's status at 6:00 a.m. (Doc. 101 Ex. A at p. 107). In the ambulance on the way to the hospital, McDonald was given another albuterol nebulizer treatment and tetributilene, an asthma medication (Doc. 101 Ex. D at p. 13). McDonald's oxygen saturation level in the ambulance was 100% (Doc. 101 Ex. E). McDonald was admitted to the hospital at 3:45 a.m. and was seen by Dr. Reyes at 3:59 a.m. (Doc. 107 Ex. Y at p. 32). At that time, McDonald was *status asmaticus*, which means he was suffering from an acute, severe asthma attack that does not respond to inhaled broncholdilators (Doc. 107 Ex. A). McDonald was awake and alert, using his accessory muscles to breath (Doc. 107 Ex. Y at p. 30). His oxygen saturation level was 93%, with a pulse of 148, blood pressure of 187 over 102 (*Id.* Ex. Y at pp. 26-27; Ex. E at p. 155). Dr. Reyes ordered that McDonald be treated with another albuterol nebulizer. McDonald was also treated with the bronchodilator Advair and nebulized epinephrine (Doc. 107 Ex. E at p. 155; Ex. X at p. 12). Treatments were continued until after 4:00 a.m. (Doc. 101 Ex. D at pp. 34-35, 39-40).

At 4:19 a.m., 4:41 a.m., and 4:55 a.m., McDonald's oxygen saturation was 100% (Doc. 101 Ex. F). At 4:57 a.m., McDonald indicated that he was having trouble and was using his accessory muscles to breathe. Nebulizer treatments continued through 5:15 a.m. (Doc. 101 Ex. D at pp. 43, 46, 50, & 55). At 5:20 a.m., Dr. Reyes decided to intubate McDonald (Doc. 101 Ex. D at pp. 54-55). Dr. Reyes attempted to intubate McDonald at 5:30 a.m. and 5:35 a.m. but each time, McDonald vomited

copiously (*Id.* at pp. 58-59, 61-62). At 5:38 a.m., McDonald continued to vomit into the intubation tube and his oxygen saturation level dropped (*Id.* at pp. 63-64). At 5:44, Dr. Reyes believed he successfully intubated McDonald, although McDonald continued to vomit (*Id.* at p. 65). At 5:53 a.m., medical staff issued a "Code Blue" and began CPR (*Id.* at p. 68). Dr. Reyes pronounced McDonald dead at 6:09 a.m. (*Id.* at p. 72).

### III. Summary Judgment Standard

Summary Judgment is proper only "if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Dynegy Mktg. & Trade v. Multi Corp., 648 F.3d 506, 517 (7th Cir. 2011) (internal quotation marks omitted)(citing FED.R.CIV.P. 56(a)); see also Ruffin-Thompkins v. Experian Information Solutions, Inc., 422 F.3d 603, 607 (7th Cir. 2005).** The party seeking summary judgment bears the initial burden of demonstrating - based on the pleadings, affidavits, and/or information obtained via discovery - the lack of any genuine issue of material fact. **Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).**

After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)(quoting FED.R.CIV.P. 56(e)(2)).** A fact is material if it is outcome determinative under applicable law. **Anderson, 477 U.S. 242, 248 (1986); Ballance v. City of Springfield, Illinois Police Department, 424 F.3d 614, 616 (7th Cir. 2005); Hottenroth v. Village of Slinger, 388 F.3d 1015, 1027 (7th Cir. 2004).** A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." **Anderson, 477 U.S. at 248**. "A mere scintilla of evidence in support of the nonmovent's petition is insufficient; a party will be successful in opposing summary judgment only when it presents definite,

competent evidence to rebut the motion." **Albiero v. City of Kankakee, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted).**

On summary judgment, the Court considers the facts in the light most favorable to the non-movant. **Srail v. Vill. of Lisle, 588 F.3d 940, 948 (7th Cir. 2009).** The Court adopts reasonable inferences and resolves doubts in the nonmovant's favor. **Id.; Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008).** Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals that "alternate inferences can be drawn from the available evidence." **Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). See also Anderer v. Jones, 385 F.3d 1043, 1064 (7th Cir. 2004).**

### IV. Analysis

**A. IDOC Defendants' Motion for Summary Judgment**

**1. David Sanders**

In response to the IDOC Defendants' motion for summary judgment, Plaintiff has indicated that she wishes to dismiss Defendant David Sanders from her Complaint (*See* Doc. 109 fn. 1). Thus, the Court **GRANTS** Plaintiff's request and **DISMISSES with prejudice** Plaintiff's claims against David Sanders.

**2. Deliberate Indifference**

Defendants Phillip Parkhill, Brian Fagerland, James Goldsborough, and Phillip Daniels seek summary judgment on Plaintiff's claims of deliberate indifference against them. They claim they are entitled to summary judgment because there was no delay in providing McDonald with medical care on May 27, 2010.

The Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'

proscribed by the Eighth Amendment." **Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).** In order to prevail on such a claim, a plaintiff must first show that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind." **Greeno v. Daley, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).**

The Defendants do not argue that McDonald's fatal asthma attack does not constitute a serious medical condition; instead, Defendants argue that they did not have the sufficiently culpable state of mind and that there was no delay on their part in providing him with medical care. The second prong of the deliberate indifference analysis requires that a prisoner show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" **Estelle, 429 U.S. at 104 (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).** "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." **Shockley v. Jones, 823 F.2d 1068, 1072 (7th Cir. 1987) (citing Duckworth v. Franzen, 780 F.2d 645, 652-53 (7th Cir. 1985)).** Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. **Id.**

Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. **Greeno, 414 F.3d at 653**. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,... and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." **Farmer v. Brennan,**

**511 U.S. 825, 842 (1994) (citations omitted).** An inmate does not have to prove that his complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." **Hayes v. Snyder, 546 F.3d 516, 524 (7th Cir. 2008) (quoting Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000)).**

The Seventh Circuit has noted that the standard is "a high hurdle…because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" **Rosario v. Brawn, 670 F.3d 821-22 (7th Cir. 2012) (Collins v. Seeman, 462 F.3d 757, 762 (7th Cir. 2006)).** "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" **Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010) (quoting Farmer, 511 U.S. at 843).**

Here, there is a dispute of fact as to when the Defendants knew that McDonald was in need of medical assistance, thus preventing the Court from granting summary judgment. Defendants contend that they did not know that McDonald was having breathing problems until shortly after midnight. At that time, Parkhill testified that he conducted his count and approached McDonald's cell where McDonald informed him that he was having an asthma attack. He then testified that he went down to Defendant Daniels and after informing Daniels of the problem, they immediately called the Health Care Unit who arrived within ten to fifteen minutes. None of the Defendants claimed to have heard yelling or banging from any of the inmates.

However, Plaintiff has pointed to evidence that creates a very different picture of the events of May 26-27, 2010. Plaintiff offers the sworn affidavits of several inmates who claim that they heard inmate Stokes banging on his cell door and yelling for help at least twenty to thirty-five minutes before Defendants arrived at McDonald's cell. Stokes stated that he began yelling for help

somewhere between 11:30 to 11:45.[2] Plaintiff also points to evidence contradicting Defendants' version of events. Plaintiff points out that the wing check report filed by Defendant Parkhill noted that a wing check was done at 12:05 and everything was "OK" and did not note McDonald's breathing problems. Plaintiff believes this evidences that no count was conducted. Clearly there is a dispute of fact as to what occurred on the night of McDonald's death and the point in time at which the Defendants learned of Plaintiff's need for help.

If Plaintiff's version of events is correct and Stokes began yelling around 11:30 p.m. and Defendants ignored his requests for help until shortly after midnight, a reasonable jury could find that Defendants were deliberately indifferent in delaying treatment for McDonald. Defendants even admit that such a delay from 11:00 p.m. to midnight could be significant enough to constitute deliberate indifference. Thus, there is an issue of fact as to when Defendants learned of McDonald's need for medical attention and, thus, whether they were deliberately indifferent by delaying McDonald's treatment. Accordingly, summary judgment as to Defendants Parkhill, Daniels, Fagerland, and Goldsborough is **DENIED**.

### 3. Warden Randy Davis

Defendant Davis also maintains that he is entitled to summary judgment on Plaintiff's deliberate indifference claim because as warden, he was unaware of McDonald's need for medical care and he cannot be held liable merely because he is warden. Plaintiff, however, maintains that Defendant Davis is liable based on his policymaking authority under ***Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).** But as Defendant rightfully points out, an arm of

---

[2] Defendants make much of the fact that the inmates claimed they heard yelling from Stokes shortly after midnight in order to support their timeline of events on May 26-27. Although the inmates' affidavits indicate that they heard Stokes banging on his cell and yelling sometime in the early morning of May 27, they also stated that Stokes banged on the cell for twenty to thirty-five minutes before help arrived. There is no evidence in the record that the inmates knew the exact time when Stokes began yelling for help and their statements that the yelling lasted twenty to thirty-five minutes before correctional officers arrived also fits with Plaintiff's timeline of events.

the state cannot be held liable under *Monell*. ***Joseph v. Board of Regents of University of Wisconsin System*, 432 F.3d 746, 749 (7th Cir. 2005).** *Monell* liability only extends to municipalities and local government units. *Id*. Further, there is no evidence that Davis was deliberately indifferent to McDonald's asthma nor is their evidence that he had actual knowledge of a threat to his safety. Accordingly, the Court **FINDS** that Defendant Davis is entitled to summary judgment and thus **GRANTS** the summary judgment motion as to Defendant Davis.

### 4. Qualified Immunity

Defendants Parkhill, Daniels, Fagerland, and Goldsborough also argue that they are entitled to qualified immunity on Plaintiff's deliberate indifference claim. To defeat a defense of qualified immunity, an inmate must demonstrate "(1) that the guard's conduct violated his constitutional rights, and (2) that the violated right was clearly established at the time of the alleged misconduct." ***Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009)(citing *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)); *Phelan v. Village of Lyons*, 531 F.3d 484, 487 (7th Cir. 2008).** The Court has sound discretion in determining which prong to analyze first. ***Stainback v. Dixon*, 569 F.3d 767, 770 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).** However, the Court has already discussed at length the issue of whether Defendants' conduct constituted a violation of McDonald's constitutional rights and has concluded that this issue is a question of fact left for the jury. ***See Lewis v Downey*, 581 F.3d 467, 478 (7th Cir. 2009).** Thus, Defendants are not entitled to qualified immunity as there are issues of material fact as to Plaintiff's deliberate indifference claim. ***Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("If there are genuine issues of fact concerning [the element], a defendant may not avoid trial on the grounds of qualified immunity.").** Accordingly, summary judgment is **DENIED** on this point.

### B. Wexford Defendants' Motion for Summary Judgment

#### 1. Nurse Reuter

Defendant Reuter argues that she is entitled to summary judgment on Plaintiff's claims against her because her treatment of McDonald did not constitute deliberate indifference. Specifically, Defendant Reuter argues that she properly identified McDonald as suffering from asthma and immediately began treatment for well over two hours, and then timely transferred him to the hospital for further treatment.

While Defendant Reuter argues that she provided McDonald with treatment, this does not resolve the issue of whether she was deliberately indifferent to McDonald's serious medical needs. **Roe v. Elyea, 631 F.3d 843, 857-58 (7th Cir. 2011) ("[A] successful plaintiff need not 'show that he was literally ignored' in his demands for medical treatment, and a defendant's showing that a plaintiff received '*some*' treatment does not resolve the issue conclusively if the treatment was 'blatantly inappropriate.'") (citing *Greeno*, 414 F.3d at 653-54 (emphasis in original)).** Deliberate indifference can be found if the treatment prescribed was blatantly inappropriate or "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." **Id. at 857**.

Here, the Court finds that Plaintiff has presented evidence creating issues of material fact as to whether Defendant Reuter's treatment of McDonald constituted deliberate indifference. Specifically, Plaintiff has offered facts that McDonald was suffering from a severe asthma attack that required extensively more treatment than what Reuter provided. There is evidence that McDonald had a severe rapid heartbeat and breathing problems when he was admitted to the health care unit. There is also evidence that McDonald might have been unconscious when he left his cell. Given the

situation that Reuter was presented with when McDonald arrived at the health care unit, Plaintiff has offered evidence that Reuter should have referred him to a doctor for treatment or called 911. Specifically, Dr. Larson testified that if a patient needed immediate attention from a doctor they would be sent to the emergency room (Doc. 107 Ex. T at pp. 30-31). He also testified that leaving a voice-mail for a doctor does not constitute a referral to a doctor (*Id.* at pp. 72-73). Plaintiff's experts also opine that Reuter should have called 911 much earlier (Doc. 107 Ex. A at p. 2; Ex. Z at p. 2). There is evidence that Reuter attempted to contact Dr. Larson only once, leaving a voicemail for him when she was unable to reach him, and attempted to treat McDonald herself for two hours before *Dr. Larson* ordered her to contact 911. The Court finds that Plaintiff has offered enough evidence from which a jury could find that Reuter's treatment was a substantial departure from accepted practice and thus constituted deliberate indifference.

There is also evidence that Defendant Reuter ignored the facility's medical protocols in treating McDonald which could also evidence deliberate indifference. The treatment protocol for asthma attacks calls for a doctor to be contacted when a patient has a PEFR under 200 (Doc. 107 Ex. B at p. 73; Ex. R at p. 36). Further, the Illinois Department of Corrections Nursing Treatment Protocols call for medical staff to contact a physician immediately if PEFR is under 300 after treatment, a patient has abnormal vital signs, and/or a patient needs a nebulizer treatment, and to call 911 for severe respiratory distress or a condition that worsens despite treatment (Doc. 107 Ex. U). Here, there is evidence that McDonald was in respiratory distress when he arrived in the infirmary and that his PEFR remained at 150 the entire time that he was in the health care unit. Defendant Reuter even stated she was concerned from the time McDonald arrived because he only had PEFR of 150 and normal PEFR was 300 (Doc. 101 Ex. B at p. 16). Upon arriving at the health care unit, McDonald had a rapid heart rate of 140, a low oxygen saturation level of only 90%, and he was wheezing and

using his accessory muscles to breathe (Doc. 107 Ex. T at p. 72).  There is also evidence to suggest that he was unconscious (Doc. 107 Exs. H-M).  While there is evidence that McDonald was in respiratory distress, Defendant Reuter did not call 911 until two hours after McDonald arrived in the health care unit.  Wexford's own administrator, Cheri Laurent, stated that calling 911 in an emergency situation constitutes "Nursing 101" (Doc. 107 Ex. V at p. 106).  Thus, there is evidence that Defendant Reuter's chosen treatment for McDonald and her failure to call 911 given McDonald's status was a substantial departure from accepted professional judgment and a jury could find that her treatment was "blatantly inappropriate."  **Roe, 631 F.3d at 843**.

Defendant Reuter argues that her failure to follow protocol does not constitute deliberate indifference, citing to **Gayton v. McCoy, 593 F.3d 610 (7th Cir. 2010)**.  In *Gayton*, the Seventh Circuit found that two nurses were entitled to summary judgment, even though one failed to follow facility protocol which required her to contact a doctor when an inmate complained of chest pains.  The Seventh Circuit found that the nurses were not deliberately indifferent because they took reasonable steps to avoid harm to the inmate. **Id. at 623**.  Defendant Reuter argues that her treatment of McDonald is comparable, and even more substantial, to that provided in *Gayton*.  However, in *Gayton*, there was evidence that the individual nurses did not know of the severity of the inmate's condition.  The Seventh Circuit noted that, during the medical examination with the nurse, the inmate did not complain of vomiting or chest pain.  **Id. at 623**.  The Court noted that had the inmate displayed such symptoms in front of the nurses their failure to contact a doctor might result in a different finding by the Court.  **Id.**  Unlike in *Gayton*, Defendant Reuter was aware of the serious symptoms that McDonald suffered from.  Upon arriving at the health care unit, McDonald's vitals were such that the protocols required an immediate referral to the doctor and possibly even a 911 call, yet there is evidence that Defendant Reuter failed to do either for over two hours even though she was

aware of McDonald's condition and of the protocols in place (Doc. 107 Ex. R at pp. 36-37). Thus, the Court finds that the facts in this case are distinguishable from those presented in *Gayton*.

Further, Defendant Reuter offers evidence that McDonald was stable in her care in support of the argument that Defendant Reuter was not deliberately indifferent and also points to other cases were treatment for asthma did not constitute deliberate indifference. Defendant Rueter makes much of the fact that McDonald's oxygen saturation level had increased to 99% while he was under her care. Defendants argue that McDonald was stabilized before he was transferred to Pinckneyville Community Hospital and thus there is no evidence of causation. However, Defendants' brief completely ignores the fact that McDonald's PEFR never rose above 150, a level which Plaintiff has evidenced was potentially life-threatening. Further, Dr. Reyes testified that McDonald was in *status asmaticus* shortly after he arrived at Pinckneyville Community Hospital with oxygen saturation level of 93 percent and a pulse of 148 (Doc. 107 Ex. X at p. 30; Ex. Y at p. 27). Thus, there is evidence contradicting the argument that McDonald was stable in Defendant Reuter's care.

As to the other cases Defendants point to, each are readily distinguishable. None of the cases involving asthma treatment were presented with the same severe asthma attack that McDonald was suffering from in this case. In **Gavin v. Armstrong, 236 F.3d 896, 899 (7th Cir. 2001),** the Seventh Circuit found that a doctor was not deliberately indifferent when an inmate was deprived of his inhaler for forty-five minutes. However, there was no evidence that he was suffering from an asthma attack at the time or that he was having breathing problems like McDonald suffered from. Likewise, in **Lee v. Young, 533 F.3d 505 (7th Cir. 2008),** the inmate was not suffering from an asthma attack when he complained about his exposure to inmate smoking, and there was evidence that the inmate had access to doctors, the asthma clinic, and medications consistently, as well as

transferred to the medical wing when recommended and to non-smoking cells, substantially different from the symptoms and treatment presented in this case.

Accordingly, the Court finds that there is enough evidence presented from which a jury could find that Defendant Reuter's treatment of McDonald was deliberately indifferent and thus Defendant Reuter is not entitled to summary judgment at this time.

**2.     Dr. Larson**

Likewise, the Court also finds that Dr. Larson is not entitled to summary judgment. Dr. Larson did not return Defendant Reuter's call until almost two hours after Defendant Reuter began treating McDonald. At that time, there is evidence that Dr. Larson knew that McDonald's PEFR was 150 and that his condition had not improved after two previous treatments. Dr. Larson testified that such a condition could be potentially life threatening (Doc. 107 Ex. T at pp. 55-56). Dr. Larson also had not physically examined McDonald, but instead chose to wait another thirty minutes before ordering that McDonald be transferred to the hospital. Dr. Larson ordered another treatment of albuterol which Defendant Reuter had already given McDonald at least twice with no change in his condition. Plaintiff has offered evidence that such continued treatment was inappropriate (Doc. 107 Exs. A at p. 5 & Z). Thus, there are issues of fact as to whether Dr. Larson's continued treatment of McDonald and failure to immediately have McDonald taken to a hospital was deliberately indifferent.

Defendant argues that his course of treatment was nearly identical to that provided by the hospital doctors. However, Plaintiff has offered evidence that McDonald received more aggressive treatment in a quicker manner than he received in the health care unit. Plaintiff points out that at Pinckneyville Community Hospital, McDonald was seen by a doctor within fourteen minutes of his arrival and was treated immediately with the steroid Solu-Medrol, while at the correctional center, it took two hours for a doctor to be reached by phone and prednisone administered. Further,

McDonald received other breathing treatments as well as supervised breathing coaching. Thus, there is evidence that McDonald received more aggressive treatment at the hospital that was not provided at the correctional facility. This could be further evidence of Dr. Larson's deliberate indifference. Thus, summary judgment cannot be granted at this time.

### 3. Wexford Health Sources, Inc.

Defendants also argue that Defendant Wexford Health Sources, Inc. is entitled to summary judgment on Plaintiff's *Monell* claims. Plaintiff's Amended Complaint (Doc. 31) alleges that Wexford is liable because it maintained a custom and practice of failing to provide timely and necessary medical treatment, which caused treatment from outside medical facilities to be denied and treatment for serious medical conditions to be denied. Plaintiff's Amended Complaint (Doc. 31) also alleges that Defendant Wexford failed to properly train its employees on handling serious medical conditions. Defendant Wexford argues that it is entitled to summary judgment because Plaintiff's *Monell* claim cannot be maintained when Larson and Reuter were not deliberately indifferent[3] and because Wexford's policies and procedures demonstrate a dedication to providing timely and appropriate patient care.

Wexford can be held liable for deliberate indifference to an inmate's medical care only if it maintained a policy or custom that violated the inmate's rights**. See Minix v. Canarecci, 597 F.3d 824, 832 (7th Cir. 2010) (corporations that contract with prison and jail facilities to provide medical care are treated as municipalities for purposes of § 1983); Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d 525, 530 (7th Cir. 2000) ("municipality may be liable for harm to persons incarcerated under its authority 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of**

---

[3] The Court finds that this argument is moot because the Court has already determined that there is enough evidence for Plaintiff's claims of deliberate indifference against Reuter and Larson to go forward.

**prisoners.'").** Such a policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation." **Minix, 597 F.3d at 832.** In other words, the corporation can be held liable when the implementation of the policy or custom inflicts an injury on the inmate. **Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917, 927 (7th Cir. 2004).**

Plaintiff can show that the policy or practice was the direct cause by showing that the policy itself violates the Constitution. **Minix, 597 F.3d at 832**. Further, if a plaintiff cannot point to an unconstitutional policy, the plaintiff can also demonstrate that the corporation was deliberately indifferent by showing "'a series of bad acts' creating an inference that...officials were aware of and condoned the misconduct of their employees." **Id. (citing Novack, 226 F.3d at 531); Woodward, 368 F.3d at 927.** A corporation, however, cannot be held liable under a theory of *respondeat superior* and thus cannot be held liable for the actions of its employees. **Woodward, 368 F.3d at 927**.

Here, Plaintiff fails to point to any policy that led to the injuries suffered by McDonald. In fact, Plaintiff acknowledges that there were policies in place which called for an inmate to be referred to a doctor and 911 to be called in certain situations when dealing with an inmate suffering from an asthma attack. When supporting her claims against Defendants Reuter and Larson, Plaintiff argues that there were policies and protocols in place, but that neither Reuter nor Larson followed those protocols in treating McDonald. Thus, there is no evidence that Wexford's policies and protocols regarding treatment of asthmatics caused McDonald's injuries.

Instead, Plaintiff argues that Wexford failed to train and supervise its employees on the emergency protocols and when to call 911 in emergency situations. Plaintiff also argues that Wexford lacked an on-site medical director to train its nurses. Plaintiff, however, fails to offer evidence to support this assertion. Plaintiff maintains that with an on-site medical director in place, the medical director would not have to juggle dozens of different facilities and would have promptly responded to

Reuter's call. However, there is no evidence to support this assertion. In fact, Dr. Larson testified that as a Regional Director he was on call for all facilities but was only the primary on-call doctor for one, two, three, or maybe more for a short period of time (Doc. 107 Ex. T at pp. 11-12). Further, Plaintiff has failed to point to any evidence showing that nurses were not trained on handling emergency situations. Plaintiff points to the testimony of Cheri Laurant for Plaintiff's argument that no training was given to nurses on when to call 911. However, Laurant's actual testimony states that nurses came to their jobs with basic training on calling 911 and that she was not "aware that that Wexford was not training people"(Doc. 107 Ex. V at pp. 106-107). Laurant stated that:

> the staff are trained that they are to contact the on-call physician if a physician is not on site and get permission or get – have the medical director agree that an off-site referral is necessary. However, in the absence of that physician, or even if a nurse feels that it is a life-or-death situation, they can send the patient off site at any time.

(*Id.*). She also testified that while she was not sure if individual nurses were given the protocols on handling a medical situation when an on-call physician could not be reached, Wexford did have such a protocol in place (*Id.* at p. 68). Defendant Reuter also testified that they were trained with the protocol sheets (Doc. 101 Ex. B at p. 30). Thus, all of the evidence suggests that Wexford had policies in place for dealing with emergency situations and that Wexford properly trained its employees, and Plaintiff has failed to point to any evidence suggesting that Wexford failed to properly train or supervise its employees. Accordingly, the Court finds that Wexford is entitled to summary judgment on Plaintiff's *Monell* claim.

### V. Conclusion

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the IDOC Defendants' motion for summary judgment (Docs. 98 & 99) and **GRANTS IN PART AND DENIES IN PART** the Wexford Defendants' motion for summary judgment (Docs. 100, 101, &

102).  Specifically, summary judgment is **DENIED** as to Defendants Parkhill, Daniels, Fagerland, and Goldsborough, and summary judgment is **GRANTED** as to Defendants Davis and Sanders.  Further, summary judgment is **DENIED** as to Nurse Reuter and Dr. Larson, and **GRANTED** as to Defendant Wexford.  Defendants Davis, Sanders and Wexford Health Sources, Inc. are **DISMISSED** from the action **with prejudice**.  Defendants Huseman and Daugherty are **DISMISSED** from the action **without prejudice**.

Thus, the only claims that remain for trial are:

1. Plaintiff's deliberate indifference claim against Defendants Parkhill, Daniels, Fagerland, and Goldsborough; and

2. Plaintiff's deliberate indifference claim against Defendants Reuter and Larson.

**IT IS SO ORDERED**.

DATED: May 10, 2013.

s/Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge
